1    BLANCA F. YOUNG (State Bar No. 217533)
     blanca.young@mto.com
2    MUNGER, TOLLES & OLSON LLP
     560 Mission Street
3    Twenty-Seventh Floor
     San Francisco, California 94105-2907
4    Telephone:     (415) 512-4000
     Facsimile:     (415) 512-4077
5
     RAY S. SEILIE (State Bar No. 277747)
6    ray.seilie@mto.com
     MUNGER, TOLLES & OLSON LLP
7    355 South Grand Avenue
     Thirty-Fifth Floor
8    Los Angeles, California 90071-1560
     Telephone:     (213) 683-9100
9    Facsimile:     (213) 687-3702

10   Attorneys for Defendants
     HEALD COLLEGE, LLC; CORINTHIAN
11   COLLEGES, INC.; EEVA DESHON;
     BARBARA GORDON; TERRY RAWLS;
12   KAREN ROSE

13                         UNITED STATES DISTRICT COURT

14          NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

15

16
     UNITED STATES OF AMERICA, ex rel.        Case No. 12-cv-02067-PSG
17   CAROLINA MARION,
                                              **NOTICE OF MOTION AND MOTION TO**
18                  Plaintiff,                **DISMISS FIRST AMENDED**
                                              **COMPLAINT; MEMORANDUM OF**
19          vs.                               **POINTS AND AUTHORITIES IN**
                                              **SUPPORT OF MOTION TO DISMISS**
20   HEALD COLLEGE, LLC; CORINTHIAN
     COLLEGES, INC.; EEVA DESHON;
21   BARBARA GORDON; TERRY RAWLS;             Judge:   Hon. Paul S. Grewal
     KAREN ROSE,                              Date:    May 5, 2015
22                                            Time:    10:00 a.m.
                  Defendants.                 Crtrm.:  5
23

24

25

26

27

28

                                                          12-cv-02067-PSG

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ...................................................................................... 1

STATEMENT OF ISSUES TO BE DECIDED....................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT...................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND............................................................ 2

ARGUMENT ............................................................................................................................ 3

I.      The First-to-File Rule Jurisdictionally Bars This Action..................................... 3

II.     Relator Fails to State a Claim For Relief ................................................................ 6

        A.      The FAC Fails to Allege an FCA Claim Premised on Attendance Fraud................. 7

                1.      The FAC Fails to Identify False Attendance Records................................... 7

                2.      The FAC Fails to Identify Any Claim Made or Obligation Owed as
                        a Result of the Alleged Attendance Fraud ........................................ 8

                3.      The FAC Fails to Plead Attendance Fraud with Particularity..................... 11

        B.      The FAC Fails to Plead an FCA Claim Premised on Enrollment Fraud................. 11

                1.      The FAC Fails To Allege False Claims Premised on the Theories
                        That Heald and its Students Were Ineligible To Receive Title IV
                        Funds ....................................................................................................... 11

                2.      The FAC Fails to Plead Enrollment Fraud with Particularity ..................... 14

        C.      Relator's Incentive Compensation Fraud Claims Fail ............................................ 16

                1.      The Public Disclosure Rule Bars Relator's Incentive Compensation
                        Fraud Claims ........................................................................................... 16

                2.      The FAC's Incentive Compensation Fraud Allegations Do Not State
                        a Claim Under Rules 8 or 9(b). ............................................................. 17

        D.      The FAC Fails to Allege an FCA Claim Premised on Academic Progress
                Fraud.......................................................................................................................... 18

                1.      The FAC Fails to Plausibly Allege Falsification of Academic
                        Progress .................................................................................................. 18

                2.      The FAC Fails to Identify Claims Made or Obligations Owed as a
                        Result of the Alleged Falsification of Student Academic Progress ........... 19

                3.      The FAC Fails to Plead Academic Progress Fraud with Particularity........ 21

**TABLE OF CONTENTS**
(continued)

Page

    E.     The FAC's Allegations About Inflated Student Body Numbers, Audit Manipulation, and Loan Default Data Do Not State a Claim Under the FCA........ 21

III.    The FAC Fails to State Claims Against the Individual Defendants.................................... 22

IV.    The Complaint Should Be Dismissed with Prejudice .......................................................... 25

CONCLUSION ...................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................. 6, 7, 8, 10

*Bly-Magee v. Cal.*,
236 F.3d 1014 (9th Cir. 2001) .......................................................................... 15, 16

*Ebeid ex rel. U.S. v. Lungwitz*,
616 F.3d 993 (9th Cir. 2010) ............................................................................. 7, 15

*Grynberg v. Koch Gateway Pipeline Co.*,
390 F.3d 1276 (10th Cir. 2004) ........................................................................... 4, 6

*Hagood v. Sonoma Cnty. Water Agency*,
81 F.3d 1465 (9th Cir. 1996) ................................................................................ 19

*Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*,
926 F.2d 505 (6th Cir. 1991) ................................................................................ 24

*Lum v. Vision Serv. Plan*,
104 F. Supp. 2d 1237 (D. Haw. 2000) .................................................................. 14

*Reddy v. Litton Indus., Inc.*,
912 F.2d 291 (9th Cir. 1990) ................................................................................ 25

*Tyger Constr. Co. v. United States*,
28 Fed. Cl. 35 (1993) ........................................................................................... 19

*U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
637 F.3d 1047 (9th Cir. 2011) ........................................................................ passim

*U.S. ex rel. Grubbs v. Kanneganti*,
565 F.3d 180 (5th Cir. 2009) .......................................................................... 7, 9, 24

*U.S. ex rel. Hampton v. Columbia/HCA Healthcare Corp.*,
318 F.3d 214 (D.C. Cir. 2003) ............................................................................... 6

*U.S. ex rel. Harshman v. Alcan Elec. Eng'g*,
197 F.3d 1014 (9th Cir. 1999) ............................................................................... 16

*U.S. ex rel. Hawaii v. Hawaii Pac. Health*,
409 F. App'x 133 (9th Cir. 2010) ........................................................................... 12

*U.S. ex. rel. Hendow v. Univ. of Phx.*,
461 F.3d 1166 (9th Cir. 2006) ................................................................................ 6

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*U.S. ex rel. Hopper v. Anton,*
  91 F.3d 1261 (9th Cir. 1996) ................................................................................... 14

*U.S. ex rel. Lee v. Corinthian Colls.,*
  655 F.3d 984 (9th Cir. 2011) ........................................................................... passim

*U.S. ex rel. Lujan v. Hughes Aircraft Co.,*
  243 F.3d 1181 (9th Cir. 2001) .................................................................. 2, 3, 4, 6

*U.S. ex rel. Pecanic v. Sumimoto Elec. Interconnect Prods., Inc.,*
  Civ. No. 12-cv-0602-L, 2013 WL 774177 (S.D. Cal. Feb. 23, 2013) ................... 22

*U.S. ex rel. Roby v. Boeing Co.,*
  100 F. Supp. 2d 619 (S.D. Ohio 2000) ................................................................. 18

*U.S. ex rel. Ruhe v. Masimo Corp.,*
  929 F. Supp. 2d 1033 (C.D. Cal. 2012) ................................................................ 24

*U.S. ex rel. Urquilla-Diaz v. Kaplan Univ.,*
  --- F.3d at ----, 2015 WL 1044887 (11th Cir. Mar. 11, 2015) ................. 9, 13, 20, 21

*United States v. Hughes Aircraft Co.,*
  162 F.3d 1028 (9th Cir. 1998) .............................................................................. 17

*United States v. Kiewit Pac. Co.,*
  Case No. 12-cv-02698-JST, 2014 WL 1997151 (N.D. Cal. May 14, 2014) ........... 23

*Wang v. FMC Corp.,*
  975 F.2d 1412 (9th Cir. 1992) ........................................................................ 16, 19

**FEDERAL STATUTES**

20 U.S.C. § 1091(a)(2) ............................................................................................ 19

20 U.S.C. § 1091(b) ................................................................................................... 9

20 U.S.C. § 1091(c)(1)(B) .................................................................................. 19, 20

20 U.S.C. § 1091(c)(2) ............................................................................................. 20

20 U.S.C. § 1091(c)(3) ............................................................................................. 20

20 U.S.C. § 1091b(3)(A) ........................................................................................ 9, 10

20 U.S.C. § 1091b(a) .................................................................................................. 9

20 U.S.C. § 1091b(b)(3)(B) ........................................................................................ 9

1

**TABLE OF AUTHORITIES**
(continued)

2

Page(s)

3

20 U.S.C. § 1094 .................................................................................................... 5, 16, 17

4

31 U.S.C. 3730(e)(4) ...................................................................................................... 16

5

31 U.S.C. § 1091b(3) ..................................................................................................... 10

6

31 U.S.C. § 3729(a)(1)(A) ............................................................................................. 13

7

31 U.S.C. § 3729(a)(1)(A), (B) ....................................................................................... 8

8

31 U.S.C. § 3729(a)(1)(B) ............................................................................................. 13

9

31 U.S.C. § 3729(a)(1)(C) ............................................................................................. 24

10

31 U.S.C. § 3729(a)(1)(G) ......................................................................................... 8, 10

11

31 U.S.C. § 3729(b)(2) ..................................................................................................... 8

12

31 U.S.C. § 3730(b)(5) .............................................................................................. 1, 2, 4

13

31 U.S.C. § 3730(e)(4) ................................................................................................. 1, 17

14

31 U.S.C. § 3730(e)(4)(B) ............................................................................................. 17

15

31 U.S.C. § 3730(h) ....................................................................................................... 23

16

**FEDERAL RULES**

17

Fed. R. Civ. Proc. 8 ........................................................................................... 10, 17, 22

18

Fed. R. Civ. Proc. 8(a) ..................................................................................................... 1

19

Fed. R. Civ. Proc. 9(b) ............................................................................................ passim

20

Fed. R. Civ. Proc. 12(b)(1) .............................................................................................. 1

21

Fed. R. Civ. Proc. 12(b)(6) .............................................................................................. 1

22

**FEDERAL REGULATIONS**

23

34 C.F.R. § 600.4 ........................................................................................................... 12

24

34 C.F.R. § 600.5 ........................................................................................................... 12

25

34 C.F.R. § 600.5(a)(3)(iii) ............................................................................................ 12

26

34 C.F.R. § 600.7(a)(1)(iv) ............................................................................................ 12

27

28

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page(s)**

3   34 C.F.R. § 668.22 ...................................................................................................7

4   34 C.F.R. § 668.22(a)(4), (5) ................................................................................ 10

5   34 C.F.R. § 668.22(b) .............................................................................................. 9

6   34 C.F.R. § 668.22(c) .............................................................................................. 9

7   34 C.F.R. § 668.22(e)(2) ........................................................................................ 10

8   34 C.F.R. § 668.32(e)(2) ................................................................................... 12, 13

9
    34 C.F.R. § 668.34(a)(5)(i) .................................................................................... 20
10
    34 C.F.R. § 668.34(c)(2) ........................................................................................ 20
11
    34 C.F.R. § 668.34(c)(3) ........................................................................................ 20
12
    34 C.F.R. § 668.187 ................................................................................................ 22
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD: PLEASE TAKE NOTICE that on May 5, 2015, at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom No. 5, United States Courthouse, located at 280 South 1st Street, San Jose, CA 95113, before the Honorable Paul S. Grewal, Defendants Heald College, LLC ("Heald"); Corinthian Colleges, Inc. ("Corinthian"); Eeva Deshon; Barbara Gordon; Terry Rawls; and Karen Rose (the "Individual Defendants") will and hereby do move the Court for an order dismissing all causes of action of the Relator Carolina Marion's ("Relator's") First Amended Complaint ("FAC") pursuant to Rule 12(b)(1),[1] for lack of subject-matter jurisdiction; Rule 12(b)(6), for failure to state a claim upon which relief may be granted; and Rule 9(b), for failure to state with particularity the circumstances constituting Defendants' alleged fraud. This Motion to Dismiss is based upon this Notice of Motion, the following Memorandum of Points and Authorities, the concurrently filed Request for Judicial Notice and exhibits thereto, other materials in the record, argument of counsel, and such other matters as the Court may consider.

## STATEMENT OF ISSUES TO BE DECIDED

1.      Whether the False Claims Act's ("FCA") first-to-file rule, 31 U.S.C. § 3730(b)(5), jurisdictionally bars Relator's action.

2.      Whether the public disclosure rule, 31 U.S.C. § 3730(e)(4), precludes relief under the FCA based on Relator's allegation that Defendants violated incentive compensation rules.

3.      Whether the First Amended Complaint fails to state a claim upon which relief can be granted either by failing to plausibly allege facts supporting a claim for relief under Rule 8(a), or by failing to state with particularity the circumstances constituting fraud under Rule 9(b).

## INTRODUCTION AND SUMMARY OF ARGUMENT

Despite being employed for less than a year as the registrar of a Heald College campus in Salinas, California, Relator alleges that Defendants engaged in a widespread, years-long scheme to

---

[1] Unless otherwise noted, all references to "Rules" are to the Federal Rules of Civil Procedure.

make false claims for federal financial aid under Title IV of the Higher Education Act ("HEA"). Relator's claims fail for multiple reasons, and should be dismissed with prejudice.

*First*, Relator's action is jurisdictionally barred by 31 U.S.C. § 3730(b)(5), which "unambiguously establishes a first-to-file bar, preventing successive plaintiffs from bringing related actions based on the same underlying facts." *U.S. ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1887 (9th Cir. 2001). Because, as Relator herself admits, this action is based on the same "core" allegations as other, earlier-filed cases against Corinthian, the FCA's first-to-file rule precludes Relator's duplicative lawsuit.

*Second*, Relator fails to state an FCA claim because she either (1) fails to identify any false record, statement, or claim or (2) fails to explain how the alleged fraud relates to any claim or obligation to the government—the "sine qua non" of any FCA cause of action. *U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011). These failures rest on Relator's fundamental misunderstanding of the regulatory framework governing Title IV financial aid. An examination of the laws and regulations that apply to the alleged misconduct shows that the FAC lacks the facts necessary to support an FCA cause of action.

*Third*, the FAC's allegations utterly fail to meet the particularity requirements of Rule 9(b). Allegations of fraud must be supported with specific details: "the who, what, when, where, and how of the misconduct charged." *Id.* at 1055. Relator does not provide anywhere close to this level of detail, opting instead to rely on conclusory allegations and the passive voice. These shortcomings are especially egregious with respect to the Individual Defendants, who were named in the FAC only after it became clear that the corporate defendants would wind down their operations. The FAC fails to explain each individual's role in the alleged fraud, and instead lumps all "Defendants" together. Rule 9(b) clearly prohibits such "everyone did everything" pleading.

## FACTUAL AND PROCEDURAL BACKGROUND

For over 150 years, Heald has provided career training and education to thousands of students. Corinthian is Heald's parent, and, in addition to Heald, operates other educational institutions throughout the United States and (until recently) Canada. Relator Marion was a

registrar for less than a year at a single Heald campus in Salinas, California.[2] Despite her very limited involvement with the school, she now alleges that she uncovered a vast "scheme" to defraud the federal government of "billions" in Title IV financial aid funds under the HEA.

Relator claims that, in pursuit of this "scheme," Defendants allegedly (1) falsified attendance records (FAC ¶¶51-60); (2) admitted students who were ineligible to receive Title IV aid (FAC ¶¶ 31-46); (3) paid incentives to admissions staff based on the number of students recruited, in violation of the HEA (FAC ¶¶ 47-50); (4) manipulated records relating to grades and academic progress (FAC ¶¶ 61-68); and (5) manipulated other information, such as "student body numbers," "audits," and "loan default data and reports" (FAC ¶¶ 69-73).

As detailed below, the same basic fraud was first alleged not by Relator, but in various public sources and in *qui tam* actions filed by other relators. Relator did not file her original complaint until April 24, 2012, long after the government was aware of the allegations. (Doc. 1). On December 3, 2014, after investigating for more than two years, the government declined to intervene in this action. (Doc. 35). On January 2015—after Corinthian emerged from a highly publicized financial crisis that concluded in an agreement with the Department of Education to either close or sell its schools—Relator filed an amended complaint containing substantially the same factual allegations but adding the four Individual Defendants, allegedly "officer[s], director[s], or managing agent[s]" of Heald and Corinthian. (Doc. 53).

## **ARGUMENT**

### I.    The First-to-File Rule Jurisdictionally Bars This Action

Relator's duplicative lawsuit is barred by the first-to-file rule and should be dismissed.

The FCA protects the government from fraud. Its *qui tam* provisions are designed to encourage private citizens, called "relators," to alert the government to alleged fraud promptly, while foreclosing repetitive litigation. To accomplish that dual purpose, the FCA's "first-to-file rule" creates a race to the courthouse by allowing only the first *qui tam* action on the subject to proceed. *Lujan*, 243 F.3d at 1189. The first-to-file rule provides:

---

[2] For this reason, while the FAC claims that the alleged fraud began in 2006, Relator's "discoveries" are all from the 2011 time period. (FAC ¶¶ 2, 34).

1

> When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action.

2

3  31 U.S.C. § 3730(b)(5). This rule is jurisdictional, and broad. *See Lujan*, 243 F.3d at 1183, 1186.

4  It absolutely bars any *qui tam* action that "alleg[es] the same material elements of fraud" as an

5  earlier *qui tam* suit, even if the allegations "incorporate somewhat different details." *Id.* at 1189.

6      In a recently-filed motion to transfer this matter to the Judicial Panel for Multidistrict

7  Litigation, Relator concedes that her action "share[s] the same core theory of liability" with three

8  other pending *qui tam* actions that pre-date her own. (RJN Ex. 1 at 7). All of those "Related

9  Actions," as Relator calls them, allege "that Corinthian committed financial aid fraud by falsifying

10  data and other documents in order to obtain Title IV funds that it was ineligible to receive, in

11  violation of the FCA." *Id.* The admitted similarity of the "core" theory in these cases is sufficient

12  to bar Relator's claims under the first-to-file rule. *Grynberg v. Koch Gateway Pipeline Co.*, 390

13  F.3d 1276, 1279 (10th Cir. 2004) (first-to-file rule precludes complaints "based in significant

14  measure on the core fact or general conduct relied upon in the first qui tam action").

15      Indeed, Relator admits (as she must) that even in the particulars, "[t]he basic facts alleged

16  in the Related Actions are similar in many material respects." (RJN Ex. 1 at 7). For example, the

17  allegation that Defendants falsified student attendance records was made in two of the earlier-filed

18  actions. One of them, a lawsuit filed by relator Christi Hays against Corinthian on September 12,

19  2011—over seven months before Relator filed her action—alleges that Corinthian "repeatedly lies

20  to [the Department of Education] about the numbers of students attending CCI classes, keeping

21  students on the rolls after they have withdrawn from CCI, in order to retain federal Title IV, HEA

22  funds." (RJN Ex. 2 ¶ 32). Hays alleges that this alleged conduct "is widespread," (*id.* ¶ 112), and

23  "extends beyond the Arlington [Virginia] campus" where Hays worked to "many, if not most, of

24  CCI's campuses," (*id.* ¶¶ 128, 110-112). Another *qui tam* complaint, filed on November 1, 2011

25  by relator Mamie Andrews, echoes these allegations. Andrews alleges that Corinthian and various

26  subsidiaries "deliberately altered student attendance records for years so they could continue to

27  collect federal aid for students who were not actually attending classes." (RJN Ex. 3 ¶ 54).

28  Andrews claims that this occurred "nationwide," (*id.* ¶ 35) and that, as a result, "[t]he United

States has given billions of dollars to Defendants' schools from 2006 through the present in the form of grants and loans for students who rarely, if ever, attended classes," (*id.* ¶ 54). Relator's allegations of attendance fraud are to the same effect.

Similarly, Relator's allegations of "enrollment fraud" are nothing new. In a complaint filed against Corinthian on March 23, 2007, relator Stephen Backhus alleges that "Defendants urge admissions representatives to enroll students without reviewing their transcripts to determine their academic qualifications to attend the schools," allowing Corinthian to "collect federal funds for these fraudulently 'enrolled' students." (RJN Ex. 4 ¶ 21). Similar allegations appear in the *Hays* complaint, which alleges that Corinthian drew Title IV funds "without the students' knowledge and consent," even though the students had withdrawn and were no longer eligible for financial aid. (RJN Ex. 2 ¶ 122). Likewise, the *Andrews* complaint alleges that Corinthian routinely falsified records "for the purpose of continuing to collect federal aid for those students who were not actually eligible." (RJN Ex. 3 ¶¶ 54, 91). Relator handily lost the race to the courthouse on her allegations that Defendants enrolled students they knew were ineligible to receive federal funds.

Relator also makes the repetitive claim that Defendants falsely certified compliance with an HEA rule banning incentive compensation to individuals involved in recruiting based on their success in securing enrollments. 20 U.S.C. § 1094. Relator's complaint is the *fifth qui tam* action to make such an allegation. In 2007, relators Nyoka Lee and Talala Mshuja filed a complaint (amended in 2011) alleging that Corinthian falsely certified that it "does not provide incentives to recruiters for doing their recruiting work," and that this purported fraud is "ongoing" and occurring "at all colleges owned by [Corinthian]." (RJN Ex. 6 ¶¶ 4, 11; Ex. 5 ¶¶ 13, 25-31, 42). Similarly, in 2007, relator Steven Fuhr filed a complaint alleged that Corinthian had a "continual" and "systemic" practice at "all" campuses of providing "bonus compensation" and "rewards" such as "cruises and other trips" to admissions representatives.  (RJN Ex. 7 ¶¶ 13-19). The same year, relator Stephen Backhus made similar allegations, claiming that Corinthian, "in flagrant violation of the Title IV ban" "compensate[s] admission representatives . . . based directly on enrollment activities." (RJN Ex. 4 ¶¶ 15-22, 30-31). More recently, in 2011, relator Mamie Andrews alleged that Corinthian engaged in "nationwide" fraud by certifying compliance with the ban while

MOTION TO DISMISS

providing "bonuses" to admissions representatives and "gifts" to students for recruiting activities. (RJN Ex. 3 ¶¶ 35-43). Relator's allegation that "admission advisors received bonuses and gifts" in exchange for enrolling students merely repeats what many others have long alleged. (FAC ¶50).

Relator's focus on a different campus and inclusion of some different details does not save her complaint. The first-to-file rule precludes a subsequent relator's action so long as it alleges "the same type of wrongdoing as that claimed in a prior action," "even if the allegations cover a different time period or location within a company," *Lujan,* 243 F.3d at 1888 (internal quotation omitted), and even if the later allegations supply "additional facts relating to *how*" the alleged scheme was carried out. *Grynberg,* 390 F.3d at 1280. Likewise, the fact that Relator names various Corinthian subsidiaries and employees as defendants who were not specifically named in the earlier actions is "not [a] difference[] in the material elements of fraud." *U.S. ex rel. Hampton v. Columbia/HCA Healthcare Corp.,* 318 F.3d 214, 218-19 (D.C. Cir. 2003) (barring claim against corporation, subsidiary, and several employees, where first complaint alleged a "corporate-wide problem" against only the corporation).

Given the admitted similarity in the material elements of the fraud alleged in the earlier-filed actions, Relator's complaint is barred by the first-to-file rule and should be dismissed.

## II.     Relator Fails to State a Claim For Relief

In addition to being jurisdictionally barred, the FAC fails to plead fraud adequately, and asserts one theory (of incentive compensation fraud) barred by the public disclosure rule.

Although Relator pleads causes of action under various FCA sections, the basic elements of any FCA claim are the same: "(1) a false statement or fraudulent course of conduct; (2) made with scienter; (3) that was material, causing; (4) the government to pay out money or forfeit moneys due." *U.S. ex rel. Hendow v. Univ. of Phx.*, 461 F.3d 1166, 1174 (9th Cir. 2006). To state a claim, Relator must provide more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). She must plead *facts,* not "labels and conclusions." *Id.* at 664. Additionally, the alleged facts, if assumed true, must "plausibly give rise to an entitlement to relief." *Id.* at 678. The plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a

defendant has acted unlawfully." *Id*. Where a complaint pleads facts that are "merely consistent with" liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*

Moreover, because the FCA is a fraud statute, the FAC must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). It "must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about [the] statement, and why it is false." *Cafasso*, 637 F.3d at 1055 (internal quotation marks omitted). "[I]dentifying a general sort of fraudulent conduct" is not sufficient. *Id.* at 1057. Further, where, as here, a broad scheme to submit false claims is alleged, Rule 9(b) requires either "representative examples of false claims" or "particular details" of the scheme "paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998-99 (9th Cir. 2010). This rule prevents "the filing of baseless claims as a pretext to gain access to a 'fishing expedition,'" and "limits any 'fishing' to a small pond that is either stocked or dead." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 191 (5th Cir. 2009).

### A.  The FAC Fails to Allege an FCA Claim Premised on Attendance Fraud

Relator attempts to allege that Defendants violated the FCA by falsifying attendance records.  However, Relator fails to allege falsity, fails to connect the alleged wrongdoing to any claim or obligation to the government, and fails to include the detail required by Rule 9(b).

### 1.  The FAC Fails to Identify False Attendance Records

Although the FAC claims that Defendants engaged in "attendance fraud," it does not identify any false attendance records. The FAC claims that Defendants created false attendance records by marking students "who did not in fact attend classes" as present. (FAC ¶52). HEA regulations, however, define "academic attendance" not only to include "physically attending a class where there is an opportunity for direct interaction between the instructor and students" but also: "[s]ubmitting an academic assignment"; "[t]aking an exam, an interactive tutorial, or computer-assisted instruction"; "[a]ttending a study group that is assigned by the institution"; "[p]articipating in an online discussion about academic matters"; or "[i]nitiating contact with a faculty member to ask a question about the academic subject studied in the course." 34 C.F.R. §

668.22. Thus, Relator's allegations that students were marked present "even if [school officials] had never seen the student," (FAC ¶ 53), or at a time when the student "was not at school at all but at work" (*id.* ¶ 54), "hospitalized" (*id.* at ¶ 58), or otherwise not "present in class" (*id.* ¶ 52), do not identify falsified attendance records, because physical presence is not required for attendance. Nor is there anything inherently fraudulent about changing an attendance record from "absent" to "present." (FAC ¶ 52, 56, 57). The student may have missed class but submitted an assignment later; the instructor may have made a mistake; or a data entry error may have required correction. The mere fact that an attendance record was changed does not remotely give rise to a plausible inference that fraud occurred. The FAC's failure to account for these "obvious alternative explanation[s]" for the alleged conduct renders Relator's fraud claim implausible. *Iqbal*, 556 U.S. at 682.

### 2. The FAC Fails to Identify Any Claim Made or Obligation Owed as a Result of the Alleged Attendance Fraud

The FAC's attendance fraud allegations also omit the "sine qua non" of any FCA cause of action: a false assertion of "entitlement to obtain or retain government property or money." *Cafasso*, 637 F.3d at 1055-56.

The FCA "attaches liability, not to the underlying fraudulent activity …, but to the 'claim for payment.'" *Id.* at 1055. Thus, the provisions of the FCA under which Relator purports to proceed require either (1) a false or fraudulent "claim," 31 U.S.C. § 3729(a)(1)(A), (B)—i.e., a "request or demand . . . for money or property" presented to the government (or to another person if the government provides or will reimburse the money or property demanded), 31 U.S.C. § 3729(b)(2); or (2) "an obligation to pay or transmit money or property to the Government," 31 U.S.C. § 3729(a)(1)(G)—a so-called "reverse false claim."

The FAC fails to allege any facts explaining how the alleged attendance fraud resulted in either a "claim" for public funds, or an "obligation" to pay the government.[3] In fact, the HEA and its regulations make clear that false attendance records do *not* implicate the public fisc except in very narrow circumstances, none of which are alleged in the FAC. Institutions are not required to

---

[3] For the attendance fraud allegations, the FAC alleges only a reverse false claim. (FAC ¶60).

take or report attendance to the government to receive Title IV funds.[4] They may be required to *refund* Title IV funds if a student stops attending, 20 U.S.C. § 1091(b), and so a false attendance record *may* implicate the FCA's reverse false claims provision. But before an institution owes any refund due to lack of attendance, *all* of the following conditions must be met:

1. The student's lack of attendance must result in the student's withdrawal from the school, 20 U.S.C. § 1091b(a);

2. The withdrawal date must occur prior to the student's completion of 60% of the term for which Title IV aid was awarded, 20 U.S.C. § 1091b(b)(3)(B); *and*

3. More federal assistance must have been disbursed to the student than she earned based on her actual attendance, 20 U.S.C. § 1091b(3)(A).

Unless and until all of these requirements are met, there is no obligation to make a refund, and no FCA claim based on alleged attendance fraud. *See U.S. ex rel. Urquilla-Diaz v. Kaplan Univ.*, --- F.3d at ----, 2015 WL 1044887, at *12 (11th Cir. Mar. 11, 2015) (relator failed to state plausible claim where complaint did not allege that students would have been ineligible for Title IV aid "but for" the alleged fraudulent scheme); *Grubbs*, 565 F.3d at 190 ("A hand in the cookie jar does not itself amount to fraud separate from the fib that the treat has been earned when in fact the chores remain undone").

The FAC fails to allege facts indicating that *any* of these prerequisites to FCA liability were satisfied. First, the FAC fails to allege that the falsified records kept students from being withdrawn. Heald's catalog provides that a student will be withdrawn after failing to attend "all scheduled classes for 14 consecutive calendar days." (FAC ¶ 51).[5] Plainly, not every missed class results in withdrawal, and thus, not every false attendance record equates with an FCA claim. For instance, a false attendance record on the student's thirteenth day of consecutive absence results in no refund obligation if the student returns the next day. *Fourteen* consecutive absences are required for withdrawal. Similarly, a false attendance record for one class would have no impact

---

[4] The FAC inaccurately asserts that 34 C.F.R. § 668.22(b) establishes an "attendance requirement." Section 668.22(b) simply defines the "withdrawal date" for schools that are required by their own policy or an outside entity to take attendance. The HEA and its regulations expressly contemplate that some schools will *not* take attendance. *See, e.g.,* 34 C.F.R. § 668.22(c).

[5] All catalog versions cited by Relator have the 14-day rule; one, from 2008, alternatively provides for withdrawal if attendance "in all classes for the quarter falls below 70 percent." (FAC ¶ 51).

on any Title IV refund obligations if the student actually attended a *different* class the same day, because withdrawal depends on consecutive absences from "all scheduled classes."

Thus, the "example" of a student with four days of allegedly false attendance does not establish that the student would otherwise have been withdrawn, because there is no allegation the student failed to attend for fourteen consecutive days. (FAC ¶ 54). Likewise, the "example" of Defendants purportedly changing one instructor's attendance records from absent to present (*id.* ¶ 56) includes no allegations regarding consecutive absences, and ignores that missed attendance for one instructor does not result in withdrawal if the student attended another instructor's class. The remaining "examples" similarly fail to tie the allegedly false attendance to whether the student would have otherwise been withdrawn. (*Id.* ¶¶ 53, 57-58). The FAC's single, conclusory sentence that Defendants falsified attendance records to "either (a) delay[] the applicable withdrawal date" and thereby "lower[] the amount HEALD was obligated to return," or "(b) completely avoid[] reporting a student as having withdrawn" and thereby "avoid[] any obligation to return Title IV funds," (FAC ¶ 60) does not suffice. Rule 8 requires more than such "bare assertions" that do no more than recite the elements of a claim. *Iqbal*, 556 U.S. at 680.

The FAC also fails to allege the second prerequisite to a refund obligation: that the student's withdrawal occurred prior to the 60% mark of the term. Once a student attends 60% or more of the period of enrollment for which financial aid is granted, the student has earned 100% of the aid, and the institution is entitled to keep all such aid disbursed for the student. 31 U.S.C. § 1091b(3); 34 C.F.R. § 668.22(e)(2). Thus, any alleged false attendance record created *after* the student attends past the 60% mark could not "conceal," "avoid" or be "material to" any refund obligation, because none would exist. 31 U.S.C. § 3729(a)(1)(G). Fatally, the FAC nowhere alleges *when*, during the period of enrollment, student attendance was allegedly falsified. Because the FAC fails to allege that false attendance records were created at a time when they could have affected a refund obligation, the FAC fails to state an FCA claim for attendance fraud.

Finally, a refund is owed only if the amount of federal aid actually disbursed to the student's account exceeds the prorated amount the student earned based on her true attendance. 31 U.S.C. § 1091b(3)(A); 34 C.F.R. § 668.22(a)(4), (5); *id.* § 668.22(e)(2), (3). Once again, the FAC

1   fails to state such facts. The FAC contains no allegations whatsoever regarding the amount and

2   timing of disbursements to students whose attendance records were allegedly altered.

3       The FAC thus fails to plead the necessary link between the purported attendance fraud and

4   any "claim" or "obligation."

5           **3.       The FAC Fails to Plead Attendance Fraud with Particularity**

6       For similar reasons, the FAC fails to meet Rule 9(b)'s requirements. Rather than provide

7   the details necessary to identify the purportedly "false" attendance records, the FAC relies on

8   sweeping generalities[6] and liberal use of the passive voice.[7] Even with respect to the few identified

9   "examples," the FAC fails to allege the names of the affected students, the name of the person

10  who purportedly falsified the attendance, the class the student allegedly did not attend when

11  marked present, the student's program of study, or the point in the term at which the attendance

12  was allegedly altered.[8] The FAC falls far short of what Rule 9(b) requires.

13          **B.       The FAC Fails to Plead an FCA Claim Premised on Enrollment Fraud**

14      A central claim in the FAC is that Defendants "recruited, enrolled and packaged

15  individuals with financial aid regardless of their eligibility." (FAC ¶ 32; *see also id.* ¶¶ 31-46, 55,

16  68, 75). These "enrollment fraud" allegations also fail to state a claim.

17          **1.       The FAC Fails To Allege False Claims Premised on the Theory That
                       Heald and its Students Were Ineligible To Receive Title IV Funds**

18
19      Relator's enrollment fraud allegations are based primarily on two theories, both of which

20  rest on a misreading of the relevant Title IV requirements. First, Relator asserts that *Heald as an*

    *institution* was ineligible to receive Title IV funds because it enrolled students who lacked a high

21  school diploma or equivalent, and therefore claims for Title IV funds to attend Heald were false.

22  _____

23  [6] *See, e.g.,* FAC ¶ 53 (various individuals (not including any Individual Defendant) "would mark
    students present in class regardless of the student's actual attendance"); *id.* ¶ 58 ("Defendants
24  knew they were falsifying attendance records").

25  [7] *See, e.g.,* FAC ¶¶ 52-57 ("[t]eachers and administrators *were* pressured to inflate attendance;"
    "[t]eachers who did not comply *were* subjected to threats"; "attendance records of students *were*
26  changed"; "Student J *was* recorded . . ."; "Individual P *was* recorded . . .") (emphasis added).

    [8] *See* FAC ¶¶ 54-58.  If anything, the limited detail in the FAC *rebuts* Relator's claims. For
27  instance, Relator claims that Exhibit 1, a monthly audit of attendance changes, shows "a uniform
    inflation of attendance in every file and no actual record of attendance." (FAC ¶57, Ex. 1). In fact,
28  Exhibit 1 reflects that the auditor gave each audited attendance change a passing audit score. (*Id.*)

1  (FAC ¶ 26). Second, Relator asserts that Defendants caused false claims when Heald allegedly

2  enrolled *individual students* who were ineligible to receive Title IV funds. (*Id.* ¶ 28).

3      ***The FAC Does Not Allege Institutional Ineligibility.*** With respect to the first theory, the

4  FAC simply misstates the law. Relator claims that Heald was not an eligible institution because it

5  "did not limit the enrollment or financial aid of HEALD students to individuals with a high school

6  diploma or its equivalent" (FAC ¶ 26, 32). But this premise is wrong: the HEA *expressly allows*

7  schools to admit students who lack a high school diploma or equivalent, if those students "[a]re

8  beyond the age of compulsory school attendance in the State in which the institution is physically

9  located." 34 C.F.R. § 600.5(a)(3)(iii).[9] A school may lose eligibility if "[f]or its latest complete

10 award year . . . *[m]ore than fifty percent of its regular enrolled students* had neither a high school

11 diploma nor the recognized equivalent of a high school diploma . . . ." 34 C.F.R. § 600.7(a)(1)(iv)

12 (emphasis added). The FAC, however, does not allege that "more than fifty percent" of Heald's

13 students lacked such credentials. Relator's inability to "identify any specific statute or regulation"

14 that required Heald to limit enrollment to high school graduates to maintain its eligibility is a

15 "fatal defect." *U.S. ex rel. Hawaii v. Hawaii Pac. Health*, 409 F. App'x 133, 135 (9th Cir. 2010).

16     ***The FAC Does Not Allege Student Ineligibility, or Tie The Alleged False Records to Any***

17 ***Claim or Obligation.*** Relator's second theory—that Defendants enrolled students who were

18 ineligible to receive Title IV funds—fails for similar reasons. The FAC asserts that Defendants'

19 alleged enrollment of students who lacked a high school diploma, "proof of graduation," or other

20 recognized equivalent resulted in false claims for Title IV funds. (*See* FAC ¶ 31-32). A student's

21 eligibility for Title IV aid, however, is not conditioned on having such credentials. A student may

22 obtain financial aid without a high school diploma or equivalent for any of four different reasons:

23      1. They obtain "a passing score specified by the Secretary [of Education] on an independently
           administered test."  34 C.F.R. § 668.32(e)(2).

24

25      2. They are enrolled in an eligible institution that participates in a state "process" approved by
           the Secretary of Education.  *Id.* § 668.32(e)(3).

26

27 ────────────────

   [9] Relator mistakenly cites 34 C.F.R. § 600.4, which describes the eligibility of nonprofit
   educational institutions. Proprietary institutions such as Heald are governed by section 600.5. Both

28 regulations contain the same language about student enrollment.

3. They were home-schooled. *Id.* § 668.32(e)(4).

4. They have "been determined by the institution to have the ability to benefit from the education or training offered by the institution based on the satisfactory completion of 6 semester hours, 6 trimester hours, 6 quarter hours, or 225 clock hours that are applicable toward a degree or certificate offered by the institution." *Id.* § 668.32(e)(5).

Relator therefore cannot state an FCA claim by alleging that an unidentified student's file contained a certificate with the words "not an equivalent diploma," (*id.* ¶ 38); that other files included transcripts indicating that students had not graduated high school or passed a high school exit exam (*id.* ¶ 39); or that Relator was unable to personally verify some students' high school graduation status, (*id* ¶ 34). HEA regulations expressly allow students to be eligible without a high school diploma or equivalent, and the FAC does *not* allege that students allegedly admitted without such qualifications *also* failed to meet one Title IV's four other criteria. *Urquilla-Diaz,* 2015 WL 1044887, at *12 (no plausible FCA violation without factual allegations that eligibility would not have been established but for the alleged fraudulent conduct); *cf. U.S. ex rel. Lee v. Corinthian Colls.,* 655 F.3d 984, 993-995 (9th Cir. 2011) (where defendant's compliance depended on meeting multiple criteria, relators failed to allege a plausible violation without alleging "any facts regarding the meaning or basis" for how one of the criteria was applied).

Similarly, the FAC's claim that high school diplomas "were regularly fabricated" (*id.* ¶ 36) fails to allege a claim under the FCA. To begin with, Relator fails to allege that students for whom diplomas were purportedly fabricated were actually ineligible for Title IV aid. In addition, Relator does not allege that, in purportedly fabricating diplomas, Defendants either "present[ed], or caused to be presented a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(A), or "ma[de], use[d], or caused to be made or used a false record or statement material to a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(B). While Heald's policy requires documentation of student eligibility (FAC ¶ 33),[10] the HEA does not obligate institutions to obtain and present a student's proof of

---

[10] The FAC selectively quotes Heald's catalog, claiming that Heald "'requires that applicants . . . . Provide proof of graduation . . .'" (FAC ¶ 33). The text omitted by the ellipses states that applicants can alternatively present "proof of successfully completing high school equivalency" or "documentation of successfully completing a minimum of six college-level credits or units from an accredited school that are applicable to a Heald College Program." (RJN Ex. 8 at 86). So, even under Heald policy, a high school diploma is not necessarily required.

graduation as a precondition to receiving Title IV funds. It is therefore unsurprising that the most Relator alleges is that (1) certain individuals "had access to and possessed diploma forms," (2) she saw a campus president "in possession of" these forms, and (3) she "observed fake diplomas" in student files. (FAC ¶ 36). These facts do not allege that any "fake" diplomas were ever "presented" along with a claim to the government, or that they were "made" or "use[d]" in a manner "material to a false or fraudulent claim." It is not enough to allege that Defendants "fabricated" diplomas—Relator must allege that the alleged false records were referenced in or otherwise linked to a claim to the government. *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996) (FCA claim must allege "a false statement which caused the United States to provide an improper benefit"); *Lum v. Vision Serv. Plan*, 104 F. Supp. 2d 1237, 1242 (D. Haw. 2000) (defendant's illegal practice of charging copayments did not support an FCA claim because bills submitted to the government "were silent as to the co-payments"). The FAC fails to do so.

For similar reasons, Relator does not state an FCA claim by alleging that Defendants instructed admissions advisors to ask applicants to "indicate" if they were a high school graduate without verifying their graduation status. (FAC ¶¶ 32-33). The HEA does not require institutions to verify that each student has a high school diploma or equivalent. And because a student may be eligible without graduating high school, even if Defendants somehow knew students falsely "indicated" they had graduated, that would not necessarily mean the students were ineligible.

Relator also cannot base an FCA claim on her allegations that Defendants "process[ed] [student] names without the required file . . . or screening" (FAC ¶ 42); or that three unidentified students "had no POG," "original documentation," or other "indication of financial aid eligibility" in their student file (FAC ¶ 35). The HEA does not condition Title IV funds on an institution obtaining or keeping any such documentation. Moreover, a missing record from a student file does not mean the student lacked eligibility, and it certainly does not plausibly establish that *fraud* occurred. In an institution of any size, perfect record-keeping cannot be expected.

### 2.     The FAC Fails to Plead Enrollment Fraud with Particularity

The FAC also fails to allege "the who, what, when, where, and how" of the alleged enrollment fraud. *Cafasso*, 637 F.3d at 1055. And, it does not plead either "representative

examples of false claims" or "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Ebeid,* 616 F.3d at 998-99.

The absence of detail in the FAC is glaring, and precludes Defendants from responding with anything other than a general denial "that they have done anything wrong." *Bly-Magee v. Cal.*, 236 F.3d 1014, 1019 (9th Cir. 2001). For example, Relator alleges that "Admissions Advisors were instructed by campus presidents" to recruit ineligible "applicants" and "recruits" without naming a single advisor, president or recruit. (FAC ¶ 32). Relator alleges that she "contact[ed] high schools" who told her that "individuals" had not graduated or passed an exit exam but fails to name the high schools she spoke to or identify specific individuals whose status she attempted to verify. (*Id.*) And throughout her enrollment fraud allegations, Relator does not identify a *specific* statement or record and explain how it is false, let alone a specific claim.

Relator's allegations about "fake diplomas" (FAC ¶ 36) also fatally lack specificity. Although Relator bases these claims on "her discoveries" (*id.* ¶ 44), she does not identify who prepared these supposedly fake diplomas or name any students who received them. Nor does she explain how she knows the allegedly "fake" diplomas she claims to have seen in student files were inauthentic. The FAC also fails to describe "particular details of a scheme to submit false claims." The FAC includes no detail about when the "scheme" began, how long it lasted, the students it affected, who was involved in conceiving and executing the scheme, or how, specifically, the scheme was carried out. The most Relator alleges is that unidentified "campus presidents and administrative personnel" "had access to and possessed diploma forms," and that she "saw the Salinas campus president in possession of the diploma forms" while telling someone to use them. (*Id.* ¶ 36). She does not name any of these individuals, or explain what exactly they did and when they did it. This is far from enough to plead the alleged scheme with particularity.

Likewise, Relator's claims that Defendants fabricated "ghost" and "phantom" students (*id.* ¶¶ 41-42) allege insufficient detail. Relator does not identify who "input phantom students . . . as new matriculations," provide examples of false names, or offer facts to support her claim that these students "never attended HEALD Colleges." (*Id.* ¶ 42). This is a paradigmatic example of

why Rule 9(b) requires specificity: Without specific examples of purportedly fake names, Defendants have no notice of any specific wrongdoing, other than Relator's unhelpful allegation that somebody falsified something.

The FAC's single "example" of a "fabricated" student is an unidentified individual who "complained" that "his personal credit had been ruined" because Heald falsely requested a loan on his behalf. (FAC ¶ 43). But even here, Relator fails to identify specifics of what happened: who enrolled "AP," what school he was alleged to have attended, and what facts indicate that he was the victim of a "false" claim instead of a "mistake" or "negligence," either of which would be insufficient for an FCA claim. *Wang v. FMC Corp.*, 975 F.2d 1412, 1421 (9th Cir. 1992).

As someone who claims to be an "insider[] privy to a fraud on the government," Relator "should have adequate knowledge of the wrongdoing at issue." *Bly-Magee*, 236 F.3d at 1019. Her failure to provide even basic details requires dismissal of Relator's enrollment fraud claims.

**C.      Relator's Incentive Compensation Fraud Claims Fail**

Relator also cannot pursue an FCA claim by alleging that Defendants falsely certified compliance with the so-called "incentive compensation ban," 20 U.S.C. § 1094, which prohibits

> any commission, bonus or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance.

**1.      The Public Disclosure Rule Bars Relator's Incentive Compensation Fraud Claims**

First, such allegations are barred by the FCA's public disclosure rule. Animated by the same concerns as the first-to-file rule, the public disclosure rule provides that the court "shall" dismiss a *qui tam* claim if (1) "substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" in one of three enumerated sources (a federal "hearing" in which the Government is a party; a federal "report, hearing, audit, or investigation;" or "the news media"); (2) unless the relator is an "original source of the information." 31 U.S.C. 3730(e)(4).

"Substantially the same" allegations that Defendants violated the incentive compensation ban were publicly disclosed many times over before Relator filed her complaint. *Id.*; *see also U.S.*

*ex rel. Harshman v. Alcan Elec. Eng'g*, 197 F.3d 1014, 1019 (9th Cir. 1999). Three prior *qui tam* lawsuits alleging such violations had been unsealed before Relator filed her complaint (*see* RJN Exs. 9-11) and therefore qualify as public disclosures. *United States v. Hughes Aircraft Co.*, 162 F.3d 1028, 1033 (9th Cir. 1998). Moreover, Corinthian's alleged incentive compensation violations were addressed in government reports and hearings (*see* RJN Exs. 12-15) and had received publicity in the news media (*see* RJN Ex. 16) before this action was filed.

Because of these public disclosures, Relator cannot pursue claims based on "incentive compensation fraud" unless she is an "original source," meaning she either (i) disclosed to the government the information on which her allegations are based *before* the public disclosure was made, or (ii) has knowledge that is "independent of and materially adds to" the public disclosures, *and* voluntarily provided the information to the government before filing her action. 31 U.S.C. § 3730(e)(4).  The FAC fails to allege Relator's original source status. First, the FAC does not allege Relator disclosed Defendants' purported incentive compensation violations to the government before they were made public by others. Second, the FAC states no facts indicating Relator knew of incentive compensation violations "independent" of what was already publicly disclosed, let alone has anything materially new or different to add. On the contrary, Relator was a registrar, not an admissions advisor, and her lack of involvement in the recruiting process is confirmed by the lack of detail in the FAC about how the alleged violations occurred. In any event, although the FAC alleges that Relator provided "a statement of all material evidence and information" to the government (FAC ¶ 9), it fails to allege that any disclosure was made pursuant to relevant FCA provision "before" filing the action, 31 U.S.C. § 3730(e)(4)(B). So even if Relator had independent and materially new information, she would not qualify as an original source.

### 2.    The FAC's Incentive Compensation Fraud Allegations Do Not State a Claim Under Rules 8 or 9(b).

The FAC also fails to state a claim based on alleged incentive compensation violations. The HEA prohibits "commission[s], bonus[es], or other incentive payment[s]" tied to enrollment success. 20 U.S.C. § 1094. This ban is not violated when employees are terminated or threatened for not enrolling enough students, nor is it violated when allegedly aggressive means are used to

recruit students. *U.S. ex rel. Lee v. Corinthian Colleges,* 655 F.3d 984, 992-993 (9th Cir. 2011) (the HEA "prohibits only a particular type of incentive compensation," not "any and all" adverse employment consequences). Enticing unqualified students to enroll (FAC ¶¶48-49), "threaten[ing]" advisors (*id.* ¶ 50), or telling them to "get recruits" (*id.*), does not violate the ban.

While the FAC alleges that "admission advisors received bonuses and gifts of clothing and luxury accessories in exchange for enrollment of students," (FAC ¶ 50), it provides no detail about who those "advisors" were, when the alleged bonuses and gifts were provided, or by whom. The single example offered—that an unnamed "campus president," on unspecified occasions, provided an employee with gifts for meeting unspecified "demands" (*id.*)—is hopelessly vague, and does not in any event support the allegedly widespread violations asserted in the complaint.

**D.**     **The FAC Fails to Allege an FCA Claim Premised on Academic Progress Fraud**

The FAC also attempts to state a claim by alleging that Defendants improperly retained students who had not maintained satisfactory progress. Relator claims that Defendants "falsified grades" to make it appear that students were maintaining a C average, and "manipulated" progress records to make it look like students would finish their studies within 150% of the published length of their program. The facts alleged, however, do not support an inference of either falsity or an improper assertion of entitlement to obtain or retain Title IV funds.

**1.**     **The FAC Fails to Plausibly Allege Falsification of Academic Progress**

The element of a "false" statement or claim is missing from Relator's academic progress allegations.  *First*, Relator fails to plausibly allege that "Defendants falsified grades and reports of academic performance." (FAC ¶ 61). Relator claims that Defendants "changed failing grades such as 'F' . . . to passing grades such as 'C'" (*id.*), but does not explain what was "false" about any grades. Nothing in the HEA prescribes when a school may issue a C grade, or prohibits a school from giving students opportunities to change a failing grade. Whether a student deserves a C or an F is highly discretionary and, as a matter of both law and common sense, cannot be "false" under the FCA. *See U.S. ex rel. Roby v. Boeing Co.*, 100 F. Supp. 2d 619, 625 (S.D. Ohio 2000) ("Expressions of opinion, scientific judgments, or statements as to conclusions about which

1  reasonable minds may differ cannot be false." (citing *Wang*, 975 F.2d at 1420-21)); *Tyger Constr.*

2  *Co. v. United States*, 28 Fed. Cl. 35, 56 (1993) ("[F]raud cannot be predicated upon the mere

3  expression of an opinion." (citation omitted)). Even if an instructor initially decided that a student

4  deserved an F, the HEA is clear that a student's "academic standing" is to be "determined by the

5  *institution*." 20 U.S.C. § 1091(c)(1)(B). An institution may, in its discretion, change students'

6  grades if they retake classes, complete remedial work, or submit late work. Where, as here, the

7  statute itself grants "fairly wide discretion" to make a particular determination, the relator cannot

8  claim that the determination was "false." *See Hagood v. Sonoma Cnty. Water Agency,* 81 F.3d

9  1465, 1477 (9th Cir. 1996).

10      *Second*, Relator's allegation that Defendants failed to dismiss students who were not on

11  track to graduating within 150% of the published duration of a program (*id.* ¶ 65), also fails to

12  demonstrate falsity. The FAC alleges that employees "are directed to extend" graduation dates,

13  "change a failing student's program of study," or "transfer a failing student from one teacher to

14  another." (FAC ¶ 66). But none of these allegations indicate falsity—there is nothing "false" about

15  extending a graduation date or adjusting student programs to help a student's progress. Relator

16  does not allege anything other than transparent changes in student course schedules.

### 2. The FAC Fails to Identify Claims Made or Obligations Owed as a Result of the Alleged Falsification of Student Academic Progress

17

18      Relator also fails to identify a "claim" made to the government or an avoided "obligation"

19

20  to the government resulting from Defendants' alleged falsification of students' academic progress.

*Cafasso*, 637 F.3d at 1055-56.

21

22      *First*, the HEA does not consider students ineligible simply because their grade point

23  average drops below a C. The FAC's assertion that "[r]eceipt of Title IV financial aid funding is

limited to students who maintain satisfactory academic progress defined as 'a cumulative C

24  average' in the course of study," (FAC ¶ 62), again mischaracterizes the law. 20 U.S.C. §

25  1091(a)(2) requires a student to "be maintaining satisfactory progress" to receive continued

26  financial assistance. A student can demonstrate satisfactory progress if, by the end of the second

27  academic year, they *either* (1) have a "cumulative C average" *or* (2) have "academic standing

28

1   consistent with the requirements for graduation, as determined by the institution." 20 U.S.C. §

2   1091(c)(1)(B). Students who fall below the standard for "satisfactory progress" can appeal, and an

3   institution may *waive* the requirement based on the death of a relative, an injury or illness, or

4   "special circumstances *as determined by the institution*." 20 U.S.C. § 1091(c)(3) (emphasis

5   added). Thus, determining if a student has failed to make student academic progress involves

6   significant institutional discretion and is not as simple as looking at a grade point average.

7          But even students who fail to make satisfactory academic progress do not immediately

8   become ineligible to receive Title IV funds. An institution can place students on "financial aid

9   warning" and continue to disburse Title IV funds to them for an entire payment period. 34 C.F.R.

10  § 668.34(c)(2). And even if a student fails to make satisfactory progress while on financial aid

11  warning, an institution can place that student on financial aid "probation" and continue to disburse

12  Title IV funds if the student complies with an "academic plan" developed by the institution. 34

13  C.F.R. § 668.34(c)(3). And at any point in time, if a student restores "academic standing consistent

14  with the requirements for graduation, as determined by the institution, for any grading period," the

15  student's eligibility for Title IV funds is restored. 20 U.S.C. § 1091(c)(2).

16         The FAC's draconian interpretation of Title IV's academic progress requirements ignores

17  the deliberately attenuated connection between a student's failure to earn a C average and

18  ineligibility for Title IV funds. Relator cannot establish an FCA violation based on Defendants'

19  alleged failure to disqualify every student who received less than a C average. The FAC must

20  allege that a student "would not have been making satisfactory progress . . . *but for* the school's

21  grade inflation." *Urquilla-Diaz*, 2015 WL 1044887, at *12. It does not.

22         *Second*, the FAC's allegation that Defendants "manipulate[d]" certain records to "conceal

23  less than full-time students, failing students, and unsatisfactory progress toward course/degree

24  completion" in order to avoid dismissing students who could not complete a program within 150%

25  of its published length (FAC ¶ 66) fails to identify a false claim or concealed refund obligation.

26  HEA regulations require institutions to "specif[y] the pace at which a student must progress . . . to

27  ensure that the student will complete the program within the maximum timeframe," defined as

28  150% of the published length of a program. 34 C.F.R. § 668.34(a)(5)(i). However, as with a

failing grade point average, the fact that a student is in jeopardy of not making "satisfactory academic progress" because they are nearing the "maximum time frame" does not automatically disqualify the student from financial aid: the same appeal, warning, and probation avenues are available to the student. And, nothing in the FAC establishes that but for the purportedly "manipulated" records, students would have failed to complete their programs within the maximum timeframe. *Urquilla-Diaz*, 2015 WL 1044887 at *12. The FAC alleges *no* facts about *when* or *how* records were allegedly altered, only reciting that records were made "to conceal . . . unsatisfactory progress." (FAC ¶ 66). Such conclusory statements are not entitled to an assumption of truth.

### 3.  The FAC Fails to Plead Academic Progress Fraud with Particularity

The FAC's allegations of academic progress fraud also lack the particularity required by Rule 9(b). Relator does not identify who caused any improper grade changes or graduation date extensions; when that occurred; how that happened; or how (if at all) these changes resulted in a false claim or avoided obligation to the government. Beyond an allegation of a *single* grade change from F to C (FAC ¶ 61) (which establishes nothing about the student's grade point *average*), Relator provides no detail about any specific false record or a resulting claim. *See Urquilla-Diaz,* 2015 WL 1044887, at *12 (affirming dismissal of similar grade inflation claims based on lack of similar detail). Relator only "identifies a general sort of fraudulent conduct but specifies no particular circumstances of any discrete fraudulent statement"—exactly the kind of pleading Rule 9(b) precludes. *Cafasso*, 637 F.3d at 1057.

### E.  The FAC's Allegations About Inflated Student Body Numbers, Audit Manipulation, and Loan Default Data Do Not State a Claim Under the FCA

Consistent with its general "spaghetti-on-the-wall" approach, the FAC makes a litany of passing allegations about other purported misconduct, with no effort to allege even the basic elements of an FCA claim, let alone any level of detail. Relator alleges that Defendants (1) falsified "the number of graduates who have decided to return to HEALD for a second degree" (FAC ¶ 69); (2) manipulated audits by "cherry pick[ing]" student files instead of using a random sample (FAC ¶ 70); and (3) manipulated student loan default data (FAC ¶ 71) and encouraged

personnel to "artificially deflate default rates" (*id.* ¶ 71). None of these allegations plead plausible FCA claims under Rule 8 or provide the detail required by Rule 9(b).

Relator does not tie any of this alleged misconduct to a claim or obligation relating to federal funds. She does not allege that Defendants are required to publish returning graduate numbers or conduct random audits to receive Title IV funds. And although an institution *may* lose eligibility, under certain conditions, if its cohort default rate rises above a certain level, *see, e.g.*, 34 C.F.R. § 668.187, Relator does not (and cannot) allege that those pre-conditions existed.  These allegations also omit the detail that Rule 9(b) requires. Relator does not identify who allegedly falsified returning student numbers, audit information, or default rates; when this information was falsified and how; or why that information was false. The FAC's conclusory assertions of wrongdoing cannot sustain a claim under the FCA.

**III.    The FAC Fails to State Claims Against the Individual Defendants**

Relator's claims against the Individual Defendants suffer from further defects. The FAC includes no detail whatsoever regarding each Individual Defendant's role in the purported fraud. "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires plaintiffs to differentiate their allegations . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud . . . . In the context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum identify the role of each defendant in the alleged fraudulent scheme." *Lee,* 655 F.3d at 997-998 (citation omitted).

The FAC utterly fails this requirement. Throughout, the FAC refers to "Defendants" as an undifferentiated group, blaming "Defendants" for every aspect of the alleged misconduct. (FAC ¶¶ 32, 41, 46, 52, 58, 62, 65-67, 76-80). Indeed, the FAC's definition of "Defendants" makes clear it is *not* distinguishing among them but instead referring "collectively to the aforesaid Defendants and each of them whether acting individually or in a managerial role on behalf of another Defendant." (FAC ¶ 17.) Such "commingling" "renders the [complaint] unclear as to what was each Defendant's role in the alleged fraud." *U.S. ex rel. Pecanic v. Sumimoto Elec. Interconnect Prods., Inc.*, Civ. No. 12-cv-0602-L, 2013 WL 774177 at *4 (S.D. Cal. Feb. 23, 2013) (dismissing complaint that used one term throughout to refer to two distinct entities).

1    Where the FAC does mention Individual Defendants by name, its allegations do not

2    provide any "additional detail as to the nature of the Individual Defendants' involvement in the

3    fraudulent acts." *Lee*, 655 F.3d at 998. In most cases, the FAC just lumps the Individual

4    Defendants together and makes conclusory claims that they "empowered" others to act or

5    condoned the purported misconduct.[11] Rule 9(b) "undoubtedly" is not satisfied where, as here, the

6    only facts alleged against individuals were that they "monitored and approved of the illegal . . .

7    practices."  *Id*; *see also United States v. Kiewit Pac. Co.*, Case No. 12-cv-02698-JST, 2014 WL

8    1997151, at *9-10 (N.D. Cal. May 14, 2014) (allegations that certain managerial employees were

9    "aware of, and acted in furtherance of" activities of other employees or "terminated or reassigned"

10   employees for "documenting and reporting" alleged misconduct failed to satisfy Rule 9(b)).

11       The few other allegations mentioning Individual Defendants by name do not even state a

12   claim under the FCA. For example, in discussing alleged incentive compensation violations, the

13   FAC claims that Barbara Gordon "directed" an employee "to get recruits any way he could" and

14   "threatened . . . harsh consequences if he did not" (FAC ¶ 50). But such adverse employment

15   actions do not violate the incentive compensation ban. *See* discussion *supra* at II.C.2. Similarly,

16   the FAC does not state a claim by alleging that Gordon purportedly instructed employees to

17   preserve paperwork for students who decide not to enroll "so that these 'enrollment agreements'

18   may be used to increase the numbers of new enrollment entries for Defendants' quarterly

19   reporting." (FAC ¶ 42). There is no Title IV requirement for "quarterly reporting," and no

20   allegation in the FAC as to how the allegedly inflated reports affected any claim for government

21   funds.

22       Nor does the FAC state a claim by alleging that the Individual Defendants retaliated

23   against Relator. (FAC ¶¶ 44-45, 59, 63, 80-81, 101, 108, 113, 119). The FAC does not include a

24   cause of action under 31 U.S.C. § 3730(h), the section of the FCA that provides relief to an

---

[11] *See, e.g.,* FAC ¶ 67 (alleging that "DESHON, GORDON, RAWLS, and ROSE empowered" Salinas campus employees "to manipulate and control the reporting/nonreporting of dropped students"); *id* ¶ 63 (alleging that "KAREN ROSE, BARBARA GORDON, TERRY RAWLS . . . and EEVA DESHON . . . decided to eliminate MARION rather than the fraud"; *id.* ¶ 80 ("Managing agents including . . . DESHON, . . . GORDON, . . . RAWLS, . . . [and] ROSE would threaten, impugn, dismantle and abuse those who challenged or complained of the fraud").

1  employee who is retaliated against for "efforts to stop" FCA violations. Allegations that the

2  Individual Defendants retaliated against Relator cannot stand in for the distinct elements of fraud

3  that must be alleged to support the substantive FCA causes of action pleaded in the FAC.

4        Finally, Relator's attempt to plead a conspiracy claim under 31 U.S.C. § 3729(a)(1)(C)

5  against the Individual Defendants fails. Relator must plead, with the specificity required by Rule

6  9(b), "(1) the existence of an unlawful agreement between defendants" to violate the FCA, and

7  "(2) at least one act performed in furtherance of that agreement." *Grubbs,* 565 F.3d at 193. The

8  FAC does neither. It includes no facts whatsoever about any agreement among the Individual

9  Defendants. *See id.* at 191-92, 193-95 (relator alleged agreement among two defendants by

10  identifying date, time, and place of meeting at which they discussed the plot, as well as "specific

11  language" indicating their agreement, but failed to allege agreement among other defendants even

12  "taking as true" allegations that each submitted false claims for a period of years). And, for the

13  reasons discussed above, it does not describe with any particularity an act taken by any Individual

14  Defendant to further the alleged plot. It is evident that each of the Individual Defendants' alleged

15  status as "an officer, director, or managing agent of HEALD and CCI" (FAC ¶¶ 13-16) was the

16  only reason they were named as defendants.  More is required to allege a claim for fraud or

17  conspiracy. *Lee,* 655 F.3d at 998.

18        Relator's conspiracy claim is also barred by the intracorporate conspiracy doctrine, which

19  "provides that, as a matter of law, a corporation cannot conspire with its own employees or

20  agents." *U.S. ex rel. Ruhe v. Masimo Corp.*, 929 F. Supp. 2d 1033, 1037-38 (C.D. Cal. 2012).

21  Relator's transparent attempt to plead around this doctrine by naming only the Individual

22  Defendants in her conspiracy count (*see* FAC ¶ 123) fails. Where, as here, "all of the defendants

23  are members of the same collective entity," the doctrine applies even if the entity itself is not

24  named in the conspiracy count. *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*,

25  926 F.2d 505, 510 (6th Cir. 1991) (affirming dismissal of conspiracy claim asserted only against

26  three employees and not their employer).

27

28

1

**IV.      The Complaint Should Be Dismissed with Prejudice**

2

The fundamental deficiencies in Relator's allegations make it futile to amend the

3

complaint, and should preclude leave to amend. *See Reddy v. Litton Indus., Inc.*, 912 F.2d 291,

4

296-97 (9th Cir. 1990). Relator's action is *jurisdictionally* barred by the first-to-file rule and

5

cannot be saved by amendment. Moreover, it is evident that Relator cannot plead additional facts

6

to support her claims. Relator purports to base her allegations on her "discoveries" as an insider,

7

(FAC ¶¶ 44, 59.), and if she really observed facts that would support an FCA claim, she could and

8

should have identified those details in her original complaint. She did not do so there, and still

9

failed to do so after amending her complaint. Her failure to adequately plead a claim after two

10

rounds of pleading strongly indicates that she would not be able to do so with further amendment.

11

<u>**CONCLUSION**</u>

12

For the foregoing reasons, Defendants request that the Court enter an order dismissing the

13

FAC with prejudice.

14

15

Respectfully submitted,

16

DATED:  March 23, 2015                         MUNGER, TOLLES & OLSON LLP
                                                                    BLANCA F. YOUNG

17

                                                                    RAY S. SEILIE

18

19

                                            By:            */s/ Blanca F. Young*
                                                                    Blanca F. Young

20

                                            Attorneys for Defendants
                                            HEALD COLLEGE, LLC; CORINTHIAN

21

                                            COLLEGES, INC.; EEVA DESHON; BARBARA
                                            GORDON; TERRY RAWLS; KAREN ROSE

22

23

24

25

26

27

28

MOTION TO DISMISS